THE UMBRIA.

THE CHARLES E. MATTHEWS.

(Circuit Court of Appeals, Second Circuit. April 30, 1907.)

No. 246.

COLLISION—STEAMSHIPS—NEGLIGENCE—STARBOARD HAND RULE—VIOLATION.

A steamship observed a tug and tow nearly a mile distant in the channel of the upper New York Harbor. The tug at this time appeared at a point on the steamer's port bow with her tow in a westerly direction across the fairway of the channel, and bound across the steamer's course. The tug and tow in fact were not moving, but the tug was attempting to take one of its scows alongside and shorten the hawser on the other. When the steamer approached she blew two whistles, which were not answered, and then blew two more, with a similar result, about 10 seconds intervening. Between the whistles the wheel was put hard astarboard, so that the steamer's course was changed 20 degrees, in an attempt to pass astern of the tow. Being unable to accomplish this, an attempt to stop was made which was ineffectual, and a collision resulted. Held, that the steamer was the privileged vessel required by article 21 to keep her course and speed until she had received a signal from the tug, and was therefore at fault in violating the starboard hand rule; and the tug was also at fault in attempting to perform her maneuver, which occupied from 500 to 750 feet of the channel, at a point where it was less than half a mile in width, and at a time when seagoing vessels were known to be due, without having some one in the pilot house of the tug on the lookout to answer and give signals.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 79.]

Appeal from the District Court of the United States for the Southern District of New York.

On appeal by all parties from a decree of the District Court for the Southern District of New York awarding damages in the sum of $17,363.23 to the libelant for injury to his scow sustained by collision with the Umbria op-

posite Bay Ridge, in the Upper Bay of New York, while the scow was in tow of the tug Matthews. The District Court held both the tug and steamship at fault and adjudged that one-half of the above amount be recoverable against each vessel. Both appeal.

The libelant also appeals, insisting that the commissioner and court erroneously disallowed $3,000 paid by it for repairs of the scow. The witnesses as to the collision, with one unimportant exception, were examined before the district judge. The opinion of the district judge, confirming the report of the commissioner upon the question of damages, is reported sub nom. The Umbria (D. C.) 148 Fed. 283.

J. Parker Kirlin, for the Umbria.
Chas. C. Burlingham, for the Matthews.
E. C. Benedict, for libelant.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. The Umbria was condemned in the District Court for starboarding when she should have held her course under the starboard hand rule. She was also held to be in fault for not stopping and reversing sooner. The tug was held to be negligent because, for her own convenience, she stopped in a navigable channel and permitted her tow to drag out astern, thus closing to navigation a considerable portion of the fairway. We think the District Court correctly disposed of the case and will indicate our reasons for holding both vessels in fault.

First, as to the Umbria. The collision occurred December 24, 1905, at about 8:21 in the morning. There was a little haze on the water but nothing to prevent objects being seen a long distance away. In fact the master of the Umbria testified that "you could see a safe distance, for a December morning." He saw the Matthews when she was a mile distant. There can be no doubt that at this time the starboard hand rule applied. The answer of the Umbria admits this as follows:

"After leaving Robbins' Reef Light abeam the Umbria sighted a mile or more distant, a tug [the Matthews] one point on her port bow. * * * Apparently, said tug, with her tow, was under way in a westerly direction across the fairway of the channel and bound across the course of the Umbria."

To the same effect is the testimony of Capt. Stephens:

"I should say from where I stood that he [the tug] was nearly right ahead, perhaps a few degrees on the port bow, the scow was a point and a half on the port bow I should say."

The pilot testified:

"When I first saw her [the tug] I thought the tow was going across the channel; of course she had me on her starboard-hand, the tow boat was right ahead of me and the scow on our port bow one point."

In The Gladys, 144 Fed. 653, 75 C. C. A. 455, we held that "the tug and barges for the purposes of navigation with reference to others are to be regarded as a single vessel."

Indeed, the counsel for the Umbria concedes that "the court was right in holding that the case fell under starboard-hand rule." The Umbria was the privileged vessel, required by article 21 to keep her course and speed, at least until she had received the assent of the

tug to navigate contrary to the rule. To demonstrate that her conduct was in complete disregard of the rule it will only be necessary to refer to her navigation from the moment she saw the Matthews until she collided with the tow, as described by the pilot who had her in charge. His testimony bearing upon this question is in substance, as follows:

"The report was 'tug right ahead,' scow on her port bow, about a point astern of the tow. I blew two whistles, I got no answer; I blew two more and no answer. I put my wheel hard astarboard before I blew the second whistle. The order to the wheel was starboard and hard astarboard. I gave the order to starboard between the whistles. There was about ten seconds between those two signals. I got no answer whatever to these signals. I blew no danger signal. I blew two whistles that is the only signal I blew. I did not wait to get a reply, I starboarded my helm right away. The first order was hard astarboard. When I found the tug lying still it didn't pass through my mind that I could go on either side. There was only one way for me to go, astern. My helm was starboarded and I kept it there; it was my duty to pass to the eastward; there was plenty of water."

The pilot's idea of correct navigation in such circumstances is stated by him as follows:

"Q. If you had supposed that the Matthews and her scow were not moving at all when you first looked at her through the glasses would you starboard your helm and try to go astern? A. I would. It is always a proper thing to go astern of every vessel when you have room and get a chance.

"Q. No matter whether you have right of way or not? A. Go astern. Blow your whistle—the first man that blows the whistle has got right of way in any harbor.

"Q. You think it is different from sea? A. Yes. At sea they blow one long blast, in the harbor they blow one and two.

"Q. Whoever blows first must stick to it? A. Yes, sir; and the man that blows a cross whistle he does wrong.

"Q. That is your view from your experience as a Sandy Hook pilot? A. Yes, sir."

Not only did the pilot fail to observe the rule but he completely reversed it. He acted apparently upon the supposition that his was the burdened vessel, and the Matthews the privileged vessel. Instead of holding his course he gave two blasts and immediately, without waiting for a reply changed his helm to hard astarboard so that the Umbria changed her heading 20 degrees. The violation of the rule was deliberate and occurred when the vessels were a mile apart and before the Matthews had indicated her intention in any way.

We are not called upon to decide what the Umbria should have done or speculate as to the result if she had obeyed the rule. It is enough that she disobeyed it at a time when for aught that appeared the Matthews was intending to follow it.

The district judge also condemned the course of the Umbria for not stopping and reversing sooner. It is true that up to the time when Capt. Stephens interfered and gave the order to "stop her" the Umbria had been going under a full speed order. It is also true that the captain testified that had the scow been three lengths instead of one length away when the order "full speed astern" was given there would have been no collision. We are inclined to think, however, that the failure to stop sooner was not a fault but an error of judgment in extremis.

Was the Matthews in fault? The District Judge found that the "collision was as near as may be about the middle of the channel." The testimony on this point is very conflicting; it is impossible to locate the place with perfect accuracy and we are unable to say that this .finding is against the weight of evidence. The collision certainly occurred in the channel and that, too, at one of its narrowest points, about a third of a mile below the bell buoy at Bay Ridge where it is, probably, a little under half a mile in width. A strong flood tide was running, and it was Saturday morning when every pilot in the port knows that a large number of ocean steamers are arriving and departing.

The Matthews stopped with two scows in tow, on hawsers aggregating 220 fathoms, somewhere about a mile above Fort Wadsworth, to take the first scow alongside and shorten the hawser of the second before entering the Kills. During this maneuver, which took over twenty minutes to execute, the entire flotilla was drifting with the tide so that just before, and at the time of the collision, the distance from the bow of the scow, which was lashed to the Matthews, to the stern of the scow that was sunk, was from 500 to 750 feet. These vessels were on a line almost athwart the channel. It was probably necessary to execute this maneuver, but it does not appear that it was necessary to execute it in a crowded channel and in such a manner that nearly a quarter of the channel was blocked for twenty minutes. The work of rearranging the tow was carried on without the slightest regard to other vessels navigating the channel. The master of the Matthews was in the cabin asleep. There was no lookout. Every one on the tug was below except the mate and two deck hands, who were engaged in heaving in the hawser by the steam capstan, which was located aft on the deck. The mate heard the Umbria's signals but paid no attention to them. In fact, nothing was done by the Matthews until the scow was almost in the jaws of collision when her engines were ordered "slow ahead."

The Matthews was at fault for executing a maneuver, which required so much time and .occupied so much space, so near the center of the channel without taking precautions to prevent passing steamers from being misled. It is not shown that it was necessary for her to occupy the channel at all and she certainly could have made the change at the edge of the channel with almost absolute safety. Having chosen the channel itself as the theater of her operations she should have had a competent lookout constantly on duty and should have been ready at all times to answer and give signals and to act promptly in order to prevent disaster to herself, to her scows and to others. With no one awake in the pilot house this was impossible.

On the question of damages the libelant was given unusual opportunities to prove the amount of his loss. The commissioner's original finding was reopened to give the libelant another opportunity to obtain the necessary proof, but in this he failed again, in the opinion of the commissioner, and a second award to the same effect was made, which was carefully reviewed by the judge who decided that the commissioner had reached a just conclusion.

We have examined the record with care and are not satisfied that a finding of fact reached after so careful and painstaking an investigation should be disturbed.

The decree is affirmed, with interest, but without costs of this court.