### THE MAUCH CHUNK.

(Circuit Court of Appeals, Second Circuit. April 30, 1907.)

### No. 205.

1. COLLISION—ADHERENCE TO RULES—DISREGARD OF SPECIAL CIRCUMSTANCES.
    A perverse adherence to the navigation rules is not justifiable, where it is manifest that such course is certain to result in danger of collision.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 224.]

2. SAME—FERRYBOATS CROSSING—VESSEL LEAVING SLIP.
    The ferryboat Northfield left her slip on the west side of pier 1, East river, at her usual time, as the Mauch Chunk, another ferryboat, was approaching from her starboard side to enter her own slip beyond. The Northfield gave her starting signal, and then a signal of two whistles, and was proceeding across the bow of the Mauch Chunk, when she was struck by the latter and sunk. It was in the daytime, and the vessels were in full view of each other, and each also knew the arriving and leaving time of the other. The Mauch Chunk had no lookout, and did not hear the starting signal of the Northfield, nor observe that she had started until within 600 or 700 feet, when the crossing signal was heard. There was a strong flood tide, which prevented the Northfield from going further to starboard than she did, and she was only about 75 feet beyond the end of the pier when the collision occurred. Held that, while the Northfield was clearly in fault in not remaining in her slip until the Mauch Chunk had passed, and in attempting to cross in the bow of the latter vessel in violation of the starboard hand rule, the Mauch Chunk was also in fault for failure to keep an efficient lookout and for insistence on the privilege given her by such rule, in disregard of the surrounding circumstances, after it was manifest that departure therefrom could alone prevent collision.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 203–205.]

    Lacombe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeals from the final decree of the District Court for the Southern District of New York entered December 21, 1905, which held both ferryboats Mauch Chunk and Northfield in fault for a collision between them, limited the liability of the respective owners, and distributed the proceeds. The Northfield was bound out from her slip which

lies on the west side of a long pier, on the east side of which lies the slip for which the Mauch Chunk was bound. On June 14, 1901, about 6 p. m. the Northfield cast off, sounded slip whistle and started under one bell. At that time the Mauch Chunk was in full view from the forward pilot house and on the starboard hand of the Northfield. When the latter boat had moved down her slip, about 30 to 40 feet, she blew a two-blast signal and rang a jingle bell; by this time she was about 75 feet from the bridge. Subsequently she blew another two-blast signal and continued on, crossing the course by which the Mauch Chunk was approaching her own slip. While so doing she was struck by the Mauch Chunk.

The opinion of the district judge is reported in 124 Fed. 786. The opinion confirming the report of the commissioner is reported in 139 Fed. 747.

Edward Grenville Benedict and George Holmes, for the Mauch Chunk.

Frederick M. Brown and Howard S. Harrington, for the Northfield.

J. Parker Kirlin and Eliot Tuckerman, for appellees.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

COXE, Circuit Judge. The majority of the court is of the opinion that the decree of the District Court is right and should be affirmed. As the cause received the most careful attention in the District Court both at the hands of the judge and the commissioner we would be entirely content to affirm on their opinions were it not for the fact that, though agreeing on all the other questions debated, we are not in accord as to the navigation of the Mauch Chunk. This situation makes it proper that we should state the reasons which lead us to hold the Mauch Chunk in fault.

The collision occurred in broad daylight with nothing to interfere with free navigation. The slips of the Northfield and Mauch Chunk were adjoining, being separated only by pier 1. The master of each vessel knew, or should have known, the custom of the other as to the hours of arrival and departure and the time required to make the trips between New York and St. George and Communipaw, respectively. From the forward pilot house of the Northfield the Mauch Chunk was seen as she left her slip on the New Jersey side of the river, and of course, the forward portion of the Northfield could have been seen from the Mauch Chunk had her navigators looked in that direction, which was straight ahead. They knew that it was the scheduled time for the Northfield to leave her slip, that she was liable to start at any moment and they knew also that they could not make their own slip without crossing the course of the Northfield. In short, many of the facts essential to make navigation safe were already known to the master of the Mauch Chunk and it was only necessary for him to keep his eyes and ears open to ascertain the remaining facts.

It is not an unfair presumption, when a collision occurs on a bright, clear day with nothing abnormal in the elements and no other craft in the vicinity to complicate necessary maneuvers, that the collision is the result of negligence or crass stubbornness, and stubbornness is often another name for negligence. The navigation rules (Act Aug. 19, 1890, c. 802, 26 Stat. 327 [U. S. Comp. St. 1901, p. 2871]) are enacted to prevent collisions, not to induce them. A perverse ad-

herence to the rules is not justifiable when it is manifest that such a course is certain to result in disaster. Article 27 provides that:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

And article. 29 provides that nothing in the rules shall exonerate any vessel or the master or crew thereof from the consequences of any neglect to keep a proper lookout or of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

The Supreme Court says:

"Errors committed by one of two vessels approaching each other from opposite directions do not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent collision, as the act of Congress provides that * * * due regard must be had to the special circumstances rendering a departure from them [the rules] necessary in order to avoid immediate danger." The Marie Martin, 12 Wall. 31, 47, 20 L. Ed. 251.

Again the court says:

"Rules of navigation are ordained to preserve life, and property and not to promote or authorize collision. Even flagrant fault committed by one of two vessels approaching each other from opposite directions will not excuse the other from adopting every proper precaution to prevent a collision." The America, 92 U. S. 432, 438, 23 L. Ed. 724.

The contention that the starboard hand rule was applicable the moment the Northfield moved away from her bridge is not vigorously disputed. There can be no doubt that under the rule she was the burdened vessel and was commanded to keep out of the way of the Mauch Chunk which was required to keep her course and speed. The importance of strict adherence to this rule is universally recognized in this country and the reasons therefor are obvious; but that there are exceptions to the rule, repeatedly recognized by the courts, cannot be controverted. Even in The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771, where the rule was rigidly maintained, the court, at page 468 of 161 U. S., and page 521 of 16 Sup. Ct., says:

"The weight of English, and, perhaps, of American authorities, is to the effect that, if the master of the preferred steamer has any reason to believe that the other will not take measures to keep out of her way, he may treat this as a 'special circumstance' under rule 24 [Act April 29, 1864, c. 69, 13 Stat. 61 (U. S. Comp. St. 1901, p. 2899)], 'rendering departure' from the rules 'necessary to avoid immediate danger.' Some even go so far as to hold it the duty of the preferred vessel to stop and reverse, when a continuance upon her course involves an apparent danger of collision. * * * The cases of The Britannia, 153 U. S. 130, 14 Sup. Ct. 795, 38 L. Ed. 660, and The Northfield, 154 U. S. 629, 14· Sup. Ct. 1184, 24 L. Ed. 680, must be regarded, however, as settling the law that the preferred steamer will not be held in fault for maintaining her course and speed, so long as it is possible for the other to avoid her by porting, at least in the absence of some distinct indication that she is about to fail in her duty."

We think the "special circumstances," recognized by all the authorities as requiring a departure from the rule, have been established by the proof in the case at bar.

The district judge found the Mauch Chunk guilty of fault in the following particulars:

First. In failing to keep a good lookout.

Second. In failing to hear the warning signal of the Northfield.

Third. In failing to see that the Northfield had started from her slip until she was about 75 feet from her bridge.

Fourth. In failing to give the Northfield a timely signal that she intended to cross the Northfield's bow.

Fifth. In failing to reverse immediately when it became apparent that the Northfield was attempting to cross her bows.

An examination of the testimony satisfies us that the master of the Mauch Chunk, having convinced himself that the starboard hand rule was an all-sufficient panoply, determined to adhere to it blindly even though human life and property might be saved by a slight departure. Notwithstanding the fact that the bow of the Northfield was in full view all the way across, and dead ahead, he testifies he "didn't notice her." Although the Northfield had sounded one long warning signal that she was about to start on her trip he did not hear it. He was asked:

"Question. What first called your attention to the Northfield? Answer. Two whistles—two short whistles.

"Question. And then did you look at her? Answer. Yes, sir."

He says that when he first saw the Northfield he was about abreast of the Staten Island slip, with his bow very nearly on a line drawn through the center of the Northfield's slip and about 320 feet out. (The district judge finds it was 700 feet). Up to that time he had not slowed the Mauch Chunk's engine and was proceeding at the rate of about 12 miles an hour. He had thus, on his own testimony, proceeded at full speed to within 320 feet of the Northfield before seeing her. He was undoubtedly correct in saying "I didn't have room to stop." How can the court hold that there was no negligence on the part of the Mauch Chunk in running blindly into a position from which it was impossible to extricate herself without collision? Can it be said that, had she heard the long starting blast, which it was her duty to hear, or had she seen the Northfield moving out, which maneuver it was her duty to see, she would still have been justified in keeping on at full speed headed for the end of the Northfield's port rack?

If this were the case of a collision occurring in open water a different rule would obtain, but here the special circumstances must be considered. A strong flood tide was running up the river, crowding the Northfield against pier 1 and making it impossible for her to proceed in an easterly direction until her stern had fully cleared the end of the pier. She could not have avoided the Mauch Chunk by porting because her helm was hard aport (with the wheel fastened in a becket) to overcome as much as possible the force of the tide. All this the master of the Mauch Chunk knew or should have known, for he had the same means of knowledge as the master of the Northfield. Enough had occurred to convince a prudent navigator that the Northfield intended to cross his bows—he should have acted accordingly.

The finding that the Mauch Chunk was at fault in failing to keep a competent lookout is amply supported by the testimony; indeed, no other proof is needed beyond the fact that no one of her crew saw the Northfield. That they did not do so seems incredible, when it is remembered that the atmosphere was clear and they were steering for the pier against which she lay. We think the books will be searched in vain for an authority holding a vessel blameless under the starboard hand rule when it appears from her own admission that her navigators did not see the burdened vessel or hear her signals until she was but 300 feet distant. If the Mauch Chunk had heard the warning signal and immediately afterwards had seen the Northfield moving from her slip it would have been notice to the Mauch Chunk that the Northfield had begun her journey to Staten Island which was due to commence at that time.

The theory that the starting signal followed by the actual start was notice only that the Northfield intended to proceed a short distance and stop, is ingenious but not persuasive. Not only was it notice of the beginning of the 6 o'clock trip of the Northfield, but the Mauch Chunk should have known that the Northfield was compelled to go straight out from her slip before she could turn either to starboard or port. In this respect it was as if her starboard rack extended as far out as pier 1.

With a tidal current of 3½ miles running across the mouth of the slip it is doubtful if the Northfield could have avoided collision if the Mauch Chunk kept on even if she had succeeded in getting well clear of the slip. In these circumstances we fail to see how it can be said that the negligence, which is hardly disputed, in failing to hear the signal and see the initial moving out of the Northfield, is not material in determining the liability of the Mauch Chunk. But for this neglect she would have known in time to have prevented the collision that the Northfield had signified her intention to cross the Mauch Chunk's bow and that this could probably not be done without great danger, there being no room for the Northfield to maneuver. The Mauch Chunk had no right to assume that the Northfield would keep out of the way after the latter had indicated a course, and was proceeding to follow it, which necessarily brought her directly in the way. In such circumstances the duty of the Mauch Chunk was clear. She should have stopped and reversed or at least slackened speed until she was well in hand. After such knowledge, to keep on at full speed was simply to invite disaster.

It is said in the brief for the Mauch Chunk that she struck the Northfield's starboard side "lightly" with her bow, but the proof indicates that the blow was of sufficient violence to cut the Northfield down to the turn of the bilge and penetrate her hull six or eight feet at a distance of five or six feet below the water line, causing her to sink within 10 or 15 minutes thereafter. When it is remembered that this blow was delivered not by the sharp stem of a yacht, but by a blunt-nosed ferryboat it is manifest that she must have been under considerable momentum at the time. Had the Mauch Chunk seen the initial movement of the Northfield and had she then reversed it is probable that the collision would not have occurred. In any view

the impact would have been so slight that the deplorable consequences of the collision would have been avoided.

If the starboard hand rule is to be strictly construed against the Northfield it should be construed with equal strictness against the Mauch Chunk, and, as pointed out by the Judge, she was not navigating in conformity with its provisions. She changed her course after the Northfield started from her bridge when, had she continued her original course, collision would have been impossible.

Other faults are pointed out in the briefs and the opinion which we deem it unnecessary to discuss as we are convinced that the fundamental fault was her reckless disregard of surrounding circumstances, her failure to see and hear what was plain and obvious, and her blind and obstinate insistence upon the rule after it was manifest that departure therefrom could alone prevent disaster.

We have considered the case upon the supposition that the starboard hand rule became applicable the moment the Northfield left her bridge, for the reason that the majority of the court is of this opinion and the proposition has not been very vigorously controverted, either at the argument or on the briefs. The writer is not, however, entirely satisfied that the proposition is correct. He thinks there is force in the suggestion that a steering and sailing rule should not apply to a vessel hampered as was the Northfield. Her movements were as circumscribed as if she was moving out of a dry dock. She could stay where she was or she could move straight out; she had no other course open to her. It would seem that the rule should not apply in such circumstances until the vessel is clear of her slip and able to direct her course to port or starboard as the exigencies of the situation may require. Article 18, rule 5 (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 2882]), recognizes this distinction as follows:

"When steam vessels are moved from their docks or berths, and other boats are liable to pass from any direction toward them, they shall give the same signal as in the case of vessels meeting at a bend, but immediately after clearing the berths, so as to be in full sight, they shall be governed by the steering and sailing rules."

We are unanimously of the opinion that the District Court was right in holding that the claim of the owner of the Northfield is subordinate to the other claims, including the death claims, under the authority of The Catskill (D. C.) 95 Fed. 700, which we approve.

The decree is affirmed with interest and costs.

LACOMBE, Circuit Judge (dissenting). I concur with the majority of the court in the finding that the Northfield was guilty of a gross violation of the starboard hand rule. That is sufficient to condemn her, without discussing further charges of fault, unless it is in some way excused. The only excuse offered is that to her first two-blast signal the Mauch Chunk at once answered with a like signal, being at the time 800 or 900 feet distant. The district judge finds that the distance was about 700 feet. If this were so, it might or might not be found that the Northfield was free from fault for proposing to cross the bows of the approaching vessel; but the difficulty with the excuse, so far as this court is concerned, is that the assertion

on which it is based is not proved. The evidence as to whether the Mauch Chunk did or did not at any time sound a two-blast signal is most conflicting. There is no clear preponderance either way. On each side of the controversy are witnesses whose situation was such that they must have known the truth, and some of whom must have knowingly testified falsely. On each side are witnesses wholly without interest in the litigation, but whose situation was not such as to make their recollection of much value. The district judge heard and saw most of the important witnesses. He has found that the Mauch Chunk did not by two-blast signal assent to the proposed maneuver of the Northfield, and upon the testimony as it is presented here in the printed record there is not sufficient to warrant a reversal of that finding.

I am unable, however, to agree with the majority of the court as to the liability of the Mauch Chunk. The fundamental fault charged against her was that, after agreeing, by sounding a two-blast signal, to allow the Northfield to cross her bows, she failed to navigate accordingly. But, since this court is unanimously of the opinion that the finding of the district judge as to her signals must be sustained, that charge must be dismissed.

The next inquiry is as to lookout. She had a man stationed on the main deck for that purpose, and the second man in the pilot house, having nothing to do with the wheel (she steers by steam), was free to give his undivided attention to the same purpose. It makes no difference, however, whether she had two or half a dozen stationed lookouts. The real question is whether they were vigilant to note what they should have seen and heard. The Northfield was in full view. She lay at the pier to which the Mauch Chunk was bound, and was known to be a ferryboat likely soon to leave her slip. Certainly her movements should have been observed and reported by a lookout who was careful and vigilant. It is undisputed that her slip whistle was not heard, nor was her forward movement observed intermediate her casting off and the blowing of her first two-blast signal. The weight of the evidence leads to the conclusion that the attention of those on the Mauch Chunk was attracted by the first two-blast signal. Such seems to be the finding of the district judge, and, indeed, the Northfield's own navigators assert that the Mauch Chunk answered it; the only conflict upon the testimony being whether that answer was a two-blast or an alarm whistle. It must be concluded that the lookouts on the Northfield were not vigilant and attentive to their duties in failing to observe the slip whistle and first forward movement from the bridge. But that finding does not determine the question as to the Mauch Chunk's liability. The most that can be claimed is that the navigation of her master—wheel, whistles, and engine room bells —must be judged precisely as if, at the very moment that the slip whistle began to sound, his attention was called to the Northfield, and all her subsequent movements and signals promptly observed.

Tested in this way, was the navigation of the Mauch Chunk's master faulty? The mere fact that the Northfield had sounded a slip whistle and moved some 30 feet down her slip, but not at all beyond her rack, so as to enable a navigator in her forward pilot house to

look both to port and starboard before beginning his navigation, was not a declaration of intention to begin navigation by disregarding the fundamental rule for crossing vessels, in the face of a vessel approaching rapidly on her starboard hand. At 30 feet from her bridge she still lay against the easterly rack of her slip, and, since the westerly rack was a short one, the four-mile tide held her pressed against the rack in a perfectly safe position until her pilot might decide to begin navigation. Rule 5. It has been frequently held that the navigator of a moving vessel is entitled to assume that the vessels he meets will themselves navigate in conformity with the rules until something occurs to indicate that they intend to violate them. The Delaware, 161 U. S. 468, 16 Sup. Ct. 516, 40 L. Ed. 771. I fail to see that there was anything to indicate such an intention on the part of the Northfield until her first two-blast signal was sounded. The witnesses from the Mauch Chunk testify that thereupon she at once rang to her engine room to reverse full speed and sounded an alarm whistle signal. I do not find in the other testimony sufficient to discredit that statement, and do not understand that the district judge has found that she failed to reverse promptly upon hearing the two-blast signal. What he does hold is that she should have reversed when the slip signal was sounded. She continued under reversed engines until collision, but with the four-mile tide the distance (700 feet, as the district judge finds) was not sufficient to stop her headway. In the position thus suddenly thrust upon her I am unable to see what else she could have done than sound alarm and reverse full speed. Had she given a three-whistle signal on top of the alarm, it would have produced no effect upon the situation. The Northfield kept on in the teeth of an alarm blast. She would undoubtedly have done the same on hearing a signal which, by promising reversed engines, might seem to indicate that the perilous maneuver she had begun might be helped out by the co-operation of the other vessel. I do not understand that the rules require that a vessel having the right of way must blow a single whistle to every vessel she sees in a slip ahead on her port hand, before such vessel has herself announced what her own navigation is about to be. Certainly rule 2 does not so provide, nor does rule 3.

The so-called "ferryboat decisions" are not helpful here. Both the colliding vessels were ferryboats, bound, respectively, in and out of slips which were located within 70 feet of each other. The Mauch Chunk was as much entitled to an unembarrassed entry into her slip as the Northfield was to an unembarrassed exit from hers. Indeed, it would seem to be a more difficult operation to make the turn into one's slip with a four-mile tide under foot than to come out of the slip against the same tide, and certainly the Northfield, pressed by that same tide against her easterly rack, was in a better position to wait without deranging her future movements than was a vessel coming on with the tide and which had to keep steerage way to make the turn in, as soon as she cleared the head of the pier against which her westerly rack rested.