THE COAMO.

THE ESSEX.

(Circuit Court of Appeals, Second Circuit. April 10, 1922.)

Nos. 268–270.

Collision ⬅️➡️63—Steam vessel and tug both held in fault.

A collision at sea, on a calm, clear day, between a steamship and a barge in a crossing tow, *held* due to faults of both the towing tug and steamship; the tug, which had the steamship on her starboard hand, being in fault for not keeping out of the way, as required by article 19 of International Rules (Comp. St. § 7858), but keeping her course and speed, and the steamship for not sooner realizing the danger, and when it was realized for turning directly into the tow.

Appeals from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by the Lehigh Coal & Navigation Company against the steamship Coamo (the New York & Porto Rico Steam-

⬅️➡️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ship Company, claimant) and the steamtug Essex (the Northern Transportation Company, claimant). Decree for libelant against the Coamo alone, and her claimant appeals. Modified.

The Coamo is a freight and passenger liner, and when on a voyage from New York to Porto Rico came in collision with the barge Allentown, which was the middle vessel of a tandem tow of three in charge of the tug Essex, which was at the time bound from Boston for Norfolk. The boats in her tow were empty coal barges. The place of collision was some 8 miles, or a little more, off Asbury Park on the New Jersey coast. The time was in the middle of the afternoon of a fair, clear day, with wind and tide negligible. The District Court held the Coamo solely at fault, and from decrees accordingly the owners of that vessel prosecuted these appeals.

T. Catesby Jones and C. Andrade, Jr., for appellees owners of the Allentown.

Burlingham, Veeder, Masten & Feary, of New York City (Chauncey I. Clark and Charles E. Wythe, both of New York City, of counsel), for the Coamo.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass. (Edward E. Blodgett and Albert T. Gould, both of Boston, Mass., of counsel), for the Essex.

Before HOUGH, MANTON and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The law applicable is sufficiently stated in The Binghamton (C. C. A.) 271 Fed. 69, 71 viz.: It is the duty of the privileged vessel to keep her course and speed until a departure is necessary to avoid immediate danger; while the burdened vessel, when on a crossing course, "so as to involve risk of collision," shall keep out of the way of the other. The Beryl, L. R. 9 P. D. 137; The Aurania (D. C.) 29 Fed. 98. It is not suggested that the trial court failed to accept this rule; the question here and below is whether on the facts proved one or both vessels violated it.

It is not disputed, nor disputable, that a more inexcusable collision has rarely been presented to any court. It occurred on a fair, clear day, in waters most familiar and then uncrowded, and between vessels which could without difficulty have seen each other for miles, and were (as to tug and steamer) full powered, fully manned, and in perfect repair. These are material facts in considering the probability of collision occurring without mutual fault.

Some of the facts, and those the most important, are (as found below) so firmly settled by the evidence as to require no more than summary statement. Coamo is a single screw steamer, 377 feet long and 46 feet beam, with a gross tonnage 4,384 and i. h. p. 3,500. She came out of New York Harbor and passed close to Scotland Light, then steered S. ½ E. (magnetic). She was making less than her full sea speed, or about 12 knots, because her engines were not yet hot. She kept this course steadily for about an hour, until her helm was suddenly put hard astarboard, and so kept with unabated speed until she ran into the Allentown, striking the latter on her starboard side near the bow at an angle of about 4 points. This relation of the vessels at collision is sworn to by the Allentown's master, and, if not confirmed,

certainly not contradicted, by a photograph taken from the Essex at the moment of collision and now in evidence. The Essex had passed close to Fire Island Lightship, and had there laid her course W. S. W. magnetic, making 5 knots (rather more than less), and maintained that course steadily until collision had occurred. Having regard to the length of the tug, of the first barge, and the connecting hawsers, the distance from the bow of the Essex to that of the Allentown was between 2,500 and 2,600 feet, and from the Essex's bow to the point of collision fully 2,600 feet. The barges followed true behind the Essex; they were steering, as did that tug; and the Allentown never changed her wheel, nor sought to, before collision. She therefore was also heading W. S. W. when hit.

Thus, as found below, the vessels were on crossing courses, and the Essex the burdened one. The conduct of the Essex arose from the delusion (it is as found below nothing else) that she was the privileged vessel, because Coamo was overtaking her. The only explanation of this delusion is ignorance. The witnesses from the tug do not appear to know what "overtaking" means. Thus the tugmaster testified on direct examination that he observed the Coamo "almost abeam," and confirmed that observation by taking a compass bearing of her, and found her bearing from him W. N. W.; and he was steering W. S. W. In other words, he asserted that a vessel 4 points on his starboard bow "was almost abeam." Such use of words and interpretation of the rules of navigation rank him with that second officer in the Binghamton, supra, who thought he had the right-of-way off Barnegat because he was bound for New York, and with the harbor pilots, who have maintained that "the first man that blows the whistle has got the right of way." The Umbria, 153 Fed. 851, 83 C. C. A. 33; The Georgic (D. C.) 180 Fed. 863, 871. With the trial judge, we lay aside the testimony from the Essex in regard to Coamo's movements. Yet, with the burdened tug holding on without the slightest reference to the steamer, the latter alone was condemned, on the ground that, although Coamo's navigation "was in fact caused by the Essex's failure to act," yet such navigation was the result of the man in charge of the steamer "losing his head," and therefore hard astarboarding when the two vessels were "at least a mile apart," and so, to all appearance, deliberately running down the Allentown—as many of the witnesses declare with the usual marine extravagance in descriptive epithet.

We quite agree that Coamo's second officer, who had been left in charge by the master after setting the course off Scotland Light, did lose his head most completely; yet it is upon the perturbed observation of such a man that the Essex's entire case rests. This second officer finally stated on cross-examination that, with the tug above five points on his port bow and distant between a mile and a mile and a half, he put his wheel hard astarboard and kept it so until collision. Upon this statement rests the argument for the Essex and the decision below, for it is obvious that, with the vessels in that position and each steadily travelling along its existing course, the swifter steamer would by holding her course and speed have passed in perfect safety across the Essex's bow.

The trouble with this statement is that it cannot possibly be true. Coamo is an ordinary type of single screw passenger boat, steering quite handily. It is a matter of record in reported cases (The Lepanto [D. C.] 21 Fed. 651; The Aurania, [D. C.] 29 Fed. 98, 121, and especially The Normandie [D. C.] 43 Fed. 151, 159), and in published works of approved authority (Knight's Modern Seamanship, p. 195), how, with what speed, and with what radius of turning, vessels both smaller and larger than the Coamo will act under a hard over wheel. Within limits, the shorter the ship and slower the speed, the shorter the turning radius; but, if Coamo had been as long as the Normandie, supra, instead of some 90 feet shorter, she would have turned a complete circle, starting at 12 knots, on a diameter of 4,430 feet; while, according to Knight, the diameter of the turning circle at "fair speed" will only vary between 3½ lengths for a 350-foot vessel, to 4½ lengths for one 500 feet long. Knight's fair speed is apparently 10 knots.

Thus, if Essex was only a nautical mile away when she bore 5 points on Coamo's port bow, and the latter vessel put her helm hard astarboard, the steamer would have turned completely round before she got within 1,000 feet of the tug, and hitting the Allentown 2,500 feet astern of Essex by this maneuver is sheer impossibility. Yet it is admittedly true that at some time Coamo did hard astarboard, and that under that wheel she did strike the Allentown at an angle of 4 points; therefore the inquiry is: How (upon the courses above stated) could such a collision have taken place?

Since the Allentown, heading W. S. W.. was struck at an angle of four points on her starboard side, the colliding vessel was necessarily heading at collision approximately E. S. E., which means that Coamo under her hard astarboard helm had changed her course 5½ points to port in order to hit Allentown. But at 12 knots a longer vessel than Coamo will swing 6 points in 2 minutes 56 seconds; and the first effect of the hard over wheel is to reduce speed, so that the average speed of the first 8 points of turn is 10.6 knots. This is a demonstration that Coamo travelled slightly less than 3,000 feet from her S. ½ E. course in order to hit Allentown, and that barge was struck at a point 2,600 feet behind the stern of the Essex, steering the same W. S. W. course.

The matter need not be pursued further, for it is a necessary conclusion that Coamo's second officer finally "lost his head" and hard asarboarded when his vessel was about 2,700 feet from the intersection point of the courses of tug and steamer, and the Essex at that moment was not over 500 feet therefrom. In other words, the probabilities are that, had both the vessels maintained their course and speed, the Essex might have cleared the Coamo, and the latter fouled the towline; but collision with some portion of the tow was inevitable.

We are persuaded that the one witness who did not lose his head was the quartermaster at the wheel of Coamo, who testified that, when he got the order to hard astarboard and obeyed, the Essex was a little on his port bow.

"Q. She was not, any part of her, ahead of you? A. Might have been a very little, but not much.

"Q. Your best judgment is about a point on your port bow? A. Yes, sir.

"Q. Was there anything on your starboard side to have prevented you from putting your wheel hard astarboard and going to starboard at that time? A. Not that I saw, sir."

We see the picture as did Quartermaster Rooney, and find the Essex in fault for having produced, by violation of article 19 of International Rules (Comp. St. § 7858), a position of danger, and the Coamo at fault for not sooner realizing that danger, and, when it was realized, for doing exactly the wrong thing. In such a situation as this, arguments concerning orders in extremis are not profitable, for there was no excuse in permitting the situation to become in extremis.

Decree modified, so as to hold both Coamo and Essex in fault, with damages appropriately apportioned. The costs of this court to the appellant; costs of the court below to be divided.