### THE JASON. THE WESTFIELD. UNITED STATES v. JASON NAV. CORPORATION.

(District Court, S. D. New York. October 3, 1922.)

Collision ⚖➡40—Both vessels held at fault, regardless of which had right of way.

    Two steamships, which collided in broad daylight, when approaching a government guardship to report, both *held* at fault for failure to sound any warning, or to check their speed in time to avoid the collision, regardless of whether one vessel was overtaking the other, so as to be bound to keep out of her way, or they were on crossing courses, so that that vessel had the right of way.

In Admiralty. Cross-libels by the Jason Navigation Corporation, owner of the steamship Jason, against the steamship Westfield, and by the United States, owner of the steamship Westfield, against the Jason Navigation Corporation, to recover damages for a collision between the two vessels. Decree rendered for divided damages.

Haight, Smith, Griffin & Deming, of New York City (Harold S. Deming, of New York City, of counsel), for Jason Nav. Corporation.

Wm. Hayward, U. S. Atty., of New York City (R. B. Romaine, Sp. Asst. U. S. Atty., of New York City, of counsel), for the Westfield and the United States.

Duncan & Mount, of New York City (Warner C. Pyne, of New York City, of counsel), for cargo of the Jason.

KNOX, District Judge. The steamer Westfield, while in course of construction at Seattle, Wash., was requisitioned by United States Shipping Board Emergency Fleet Corporation, pursuant to an executive order, dated July 11, 1917, issued under authority of an act of Congress entitled "An act making appropriations to supply urgent deficiencies in appropriations * * * for the fiscal year ending June 30, 1917, and for other purposes," approved June 15, 1917 (40 Stat. 182). When completed, the vessel was delivered by the Emergency

---

⚖➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Fleet Corporation to the United States Shipping Board, as agent of the President. She was then registered in the name of the United States, and turned back to the Fleet Corporation for operation and management. For such purpose she passed into the hands of the Kerr Steamship Company, as agent of the Fleet Corporation, and, at the time of the accident out of which these proceedings arise, was thus being operated, and was engaged in carrying cargo belonging to the Italian government at a stipulated tonnage rate.

On the afternoon of July 21, 1918, the Westfield and the steamer Jason, both loaded, were proceeding from their respective anchorages, in or near to Lynnhaven Roads, to join a convoy of 30 or 40 vessels that was forming in position for departure to Europe, outside of Cape Henry. Before reaching the convoy, the vessels were required to pass close by, and hail, the United States guardship Bache, which lay head out to sea, about 2½ miles to the east of the cape. As the vessels, on seemingly parallel courses, approached the guardship, one or the other, depending upon the testimony accepted, is said to have changed her course, with the result that a collision occurred, with such injuries to the Jason as to necessitate her return to port for repairs.

Thereafter a libel for damages was filed by the owners of the Jason against the Westfield. The United States, appearing specially, suggested the want of jurisdiction in the court over the Westfield, owing to her alleged public character, and asked the dismissal of the libel. The court, conceiving itself to be entitled to proceed, overruled the suggestion and required an answer to the allegations made for the Jason. An answer was interposed upon December 5, 1919, and later was followed by a cross-libel. The two suits were consolidated, and a trial upon the merits has been had.

The decision to be rendered turns in largest measure upon the facts, and they are most difficult of ascertainment. All witnesses from the Jason claim that the Westfield was an overtaking vessel, and that, a little short of deliberately, she turned across the Jason's course, and ran into her. Those from the Westfield insist that she was the boat ahead, and that the Jason, being a boat of greater speed, overtook her, and, in trying to crowd in between the Westfield and the Bache, brought about the collision. Disinterested witnesses from the Bache, and from the British ship Lexington, which was going ahead on the starboard bow of the Jason, are not in all respects in accord, and the court is not a little perplexed as to the findings to be made. However I shall attempt to reach some conclusion.

The accident took place at 3:52 o'clock p. m. on a clear day, and was unaccompanied by any complications of wind or tide. In seeking to exculpate itself for not turning out when it was observed that a collision was imminent, the Westfield says she had shallow water to her port hand, while the Jason claims that she could not go to starboard, owing to the presence of the Lexington; and so I approach the question as to whether one ship, or both, are to be held responsible for what, in any event, is almost inexcusable navigation.

It may here be remarked that, although the vessels were aware of the close quarters in which they were navigating, and of the danger im-

pending, neither gave a signal to the other, but each held on without any material change of course or speed until right in the jaws of collision. Perhaps it is also better to here record what was seen and done by the witness Connover, a chief engineer of the United States Coast and Geodetic Survey. He is not only disinterested, save so far as he is in the employ of the government, but was, in addition, a most intelligent and observant witness. At the time of the accident he was a lieutenant in the navy, and was on duty aboard the Bache. As the Jason and the Westfield approached his ship, he realized that they were about to collide. Being a devotee of amateur photography, and having a camera at hand, he went to the rail, where he took four pictures of the two ships. These show the vessels either just before or at the moment of contact, and at successive stages of the period for which they hung together. A narrative of his testimony follows:

"Off the port quarter of the Bache, I saw what appeared to be a very large vessel, with one stack, which afterwards turned out to be two vessels with stacks in range. ❋ ❋ ❋ I called the attention of the other officers to the peculiar craft that was coming, and they all jumped up to look at it. They were then about three lengths astern. The small vessel [the Jason] appeared to be ❋ ❋ ❋ nearer ❋ ❋ ❋ to the Bache. ❋ ❋ ❋ The large vessel [Westfield] was ❋ ❋ ❋ further away. They appeared to be on parallel courses, coming up alongside the Bache, going to sea. I could not say how far they were apart, as they appeared one vessel. We stood watching, and the small vessel started to cross the bow of the larger vessel, and it appeared as though there was going to be a collision, so I got the camera, and started taking snapshots. I centered the lens on the stack of the Jason, and held the camera at right angles to the rail of the Bache. I stood on the port gangway, and took the first photograph from that position. In all I took four pictures, the first three were exposed one after the other, as quickly as I could roll up the camera and set it. The fourth was some little time between, because I watched to see what would happen [after the collision]. She did not sink, and I watched. The photographs were taken within 15 or 20 feet of the same position.

"When I first saw the vessels, the stacks were in range, and as they came on—oh, just maybe a couple of lengths—I saw that one was cut off; he headed the other fellow off to her port, and as she started to do that, I saw there was something going to happen, so I got the camera and took a shot as quick as I could. By that time they were practically abreast of me and about 1,200 or 1,500 feet off. The one nearest to me [the Jason] seemed to be going the fastest. I could not see the ships actually come together, because the bow of the large ship was on the opposite side of where I was; but they appeared to be coming together. I could not hear the crash of collision, but I heard the bells ringing and calls to quarters. From the time I first saw the vessels until the first picture was taken was about three minutes. During that time they passed from a point on my port quarter to a point almost on my beam. The last picture was taken when they were on the port bow. When I first saw them, the smaller vessel [the Jason] appeared to be ahead of the other. When photograph No. 1 was taken, the smaller vessel had commenced to change her course. It had changed before I got the camera; that is why I got it. So far as I know, the larger vessel continued her course. The angle of collision was about two points on the Jason port quarter."

The smooth log of the Bache, signed by an ensign named McMillan, who witnessed the collision, reads:

"3:54 a. m. [which is a typographical error for p. m.] S. S. Jason standing, out, crossed bow of U. S. S. Westfield and was run down. She was struck amidships; she gave no signals. She did not appear to be damaged below

water line. S. S. Jason signaled that she was damaged and was returning to port. U. S. S. Westfield continued to sea with convoy."

According to Capt. Forsell, of the Jason, a master of 14 years' experience upon all classes of ships, he got under way from his anchorage at 3 p. m., setting a course of south 85° east, true, and at 3:25 p. m. he had Cape Henry abeam. He was making a speed of about 9 knots per hour. At this time the course was changed to south 69° east, true. From then on it remained the same. It was also at this time that the Westfield was noticed astern. She came up abeam, and, being about two or three ship lengths off, she stopped to drop her pilot. When the Jason had progressed a further distance of four or five ship lengths, the Westfield was observed to have again gotten under way, and to be coming upon the Jason's port quarter. Two other ships were to starboard of the latter; the nearest one stopped to let off her pilot, and the other, the Lexington, continued on a course parallel to the Jason. The Westfield continued to approach, and when within 150 feet Forsell sung out and asked what she was trying to do. He did this, although he says he saw no person on the bridge, but thinks some one might have been in the pilot house. When she got nearer, he could see one of the officers handling the telegraph, and apparently putting it full speed astern. The Westfield then swung to starboard and collided. This, in the witness' opinion, was due to her having a right-hand propeller.

As to the alleged position of the ships, Forsell's testimony is, in part, corroborated by Capt. Ledsome, of the Lexington. He says his ship was just west of the guardship, and that, raising anchor, he headed for it. The Jason followed close under his stern, to starboard, and began to overhaul him. Thereupon the Lexington put on more speed and drew away. At 3:20 Ledsome saw the Westfield on his port quarter about two miles away. He next saw her in the same position, but only 100 to 150 yards off, a little abaft the beam of the Jason. The latter is said to have then crossed from the Lexington's starboard quarter on a tangent towards the Westfield. The Lexington was planning to pass the Bache to starboard, and Ledsome asserts that the Jason first tried to get in between him and the guardship, and, being frustrated in this, she sought, I infer, to crowd out the Westfield in passing the Bache on her port side. He further says that, when the ships collided, there was but about 16 degrees difference in their respective courses, and that the Westfield made no change save that, being driven onto a shoal, she nevertheless gave way as much as possible to afford room for the Jason.

Before giving testimony in the suit, the master of the Westfield died, and the member of her company who should be best qualified to testify as to what happened is Chidley, her chief officer. His evidence does not impress me as being especially accurate, and for this reason is of little or no help. The third officer, however, a man named Sorenson, gave the appearance of having an earnest desire to state the facts as he saw them. He was not on watch, but stood on the starboard side of the saloon deck. It is his version that he first saw the Jason as she heaved her anchor. She was then broad on the starboard

quarter two miles off. The Westfield, which was under way, stopped to drop her pilot, and in the interval thus occasioned, the Jason came up astern. Continuing at a speed greater than that of the Westfield, she finally got on a course parallel with her and 200 feet away. When her bridge was even with the stern of the Westfield, and then distant to starboard only 50 or 75 feet, he says he saw the rudder of the Jason swing sharply to port and her bow cut across that of the Westfield. Ten minutes prior to this, he says that the Jason, being behind, and running on a slightly converging line, began to crowd the Westfield towards the shore banks abreast of Cape Henry. The Westfield then made a slight change to port, the extent of which the witness does not know, but which is claimed by the first officer to have amounted to three points.

The Westfield's log shows her heading to have been for the guard-ship, so as to pass on its starboard side within hailing distance. It being practically conceded that all witnesses, with the exception of Connover, are wrong in their statements as to how the guardship headed, I take it that the Westfield intended to pass to port of the Bache. After this lengthy summary of only a small part of the testimony in the case, it will be seen that there is little or no hope of reconciling the discrepancies. As for conflicts, the testimony not specifically mentioned surpasses that already detailed, and a further statement seems fruitless.

One thing more, however, should be said, and it is this: The Westfield's speed seems to have been less than that of the Jason. She had trouble on more than one occasion in keeping up with convoys, not making more than six to eight knots per hour, and she was, I am quite certain, not going over seven or eight knots on the day of the collision, while the Jason was making about nine knots.

Having come thus far, what disposition is to be made of these suits? From Sorenson's testimony, the vessels were undoubtedly upon converging courses. When abeam, they were but 200 feet apart. Yet, within a few minutes, and before the Jason's alleged swerve to port took place, the distance between them had lessened to 50 or 75 feet, and no signal sounded from either. Specific rules of the road are of course to be obeyed, and failure so to do usually brings about the imposition of liability. It is, however, also the law that neglect upon the part of one ship to observe a specific rule does not excuse another in dangerous proximity to the first from taking cognizance of the general prudential rule which requires that due regard must be had for any special circumstances which may render a departure from specific rules necessary in order to avoid a collision.

As I see the case, there was a woeful failure of both vessels in this particular, and that, irrespective of whether the Westfield was being overtaken, or was on a crossing course, and herself bound to keep out of the way. As was held in The John H. Starin, 162 Fed. 146, 89 C. C. A. 170, there is no right of way on which a vessel is entitled to insist, when it is obvious that it will result in collision. There is much more authority to the same effect, and it is so well known to all of us as to make its citation unnecessary. Whatever may here have

been the start of the trouble, and, as to that, one man's guess is as good as another's, each ship saw that the other was holding on to a course that would, in short order, bring about a collision. If one ship had the right of way, and the other was infringing upon that right, it is a wonder the whistle did not protest the fact. When the usurpation of unentitled privileges was further insisted upon, with danger becoming more imminent with every turn of the propellers, one captain shouted to an unseen officer upon a boat 150 feet away and allowed his precautionary measures to end with the shout. And upon the other ship not even a cry was raised. It seems to me, it was high time for danger signals. Indeed, it was ripe for more than that; the moment had come for affirmative action in the way of stopping the ships. It was not taken until the last instant when the reversal of the Westfield's engines may perhaps have accelerated the collision. This may, or may not, have been the swerve of which the witnesses speak. If it was, it is quite possible that the angle of vision of the observers was such as to give the impression that the swerve was made by the Jason.

Be this as it may, I have made up my mind that each vessel fell so far short of its duty in the presence of an easily avoidable danger as to require that both be held at fault. A decree for half damages may be submitted.