## THE WEST HARTLAND.

(Circuit Court of Appeals, Ninth Circuit. November 17, 1924.)

No. 4298.

**1. Collision ⊙⟋38—Privileged vessel bound to observe rules.**

That one of two vessels is privileged and entitled to keep her course does not excuse her for failing to observe the rules, for inattention to signals or failure to answer, where an answer is required, or from adopting such precautions as may be necessary to avoid a collision.

**2. Collision ⊙⟋40—Circumstances indicating faults of both vessels.**

There can seldom be a collision in the open sea in clear weather, where there is no obstruction and the vessels are plainly visible to each other for a long distance, without fault on the part of both vessels.

**3. Collision ⊙⟋38—Privileged vessel held chargeable with fault for collision.**

The privileged of two steamships approaching each other on a clear night in Puget Sound on crossing courses held in fault for a collision, where for a considerable time before the collision she was in doubt as to the course of the other vessel, but gave no danger signals, and after signaling her intention to keep her course and speed reversed full speed astern without warning.

**4. Collision ⊙⟋140—Owner of vessel surrendered in limitation proceedings cannot claim for subsequent repairs.**

In proceedings for limitation of liability for collision damages, the measure of the owner's liability is the value of the vessel immediately after the collision, and on her surrender he cannot claim a prior lien for the cost of repairs subsequently made, beyond what were necessary for her preservation.

**5. Collision ⊙⟋130—Interest not recoverable as matter of right on death and personal injury claims.**

Refusal to allow interest on death and personal injury claims arising out of collision held not error.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Petition of the United States, acting through the United States Shipping Board, represented by the United States Shipping Board Emergency Fleet Corporation, as owner of the steamship West Hartland, for limitation of liability for collision with the steamship Governor. From the decree, petitioner, Pacific Steamship Company, claimant of the Governor, and others, appeal. Affirmed.

For opinions below, see 295 F. 547; 297 F. 330.

G. R. Snider, Admiralty Counsel, U. S. Shipping Board, and Horace M. Gray, Asst. Admiralty Counsel, U. S. Shipping Board, both of New York City (MacCormac Snow, District Counsel, U. S. Shipping Board, of Portland, Or., and Bronson, Robinson & Jones, of Seattle, Wash., of counsel), for the United States.

B. S. Grosscup and W. C. Morrow, both of Seattle, Wash., for Pacific S. S. Co.

W. H. Bogle, Lawrence Bogle, W. H. Hayden and F. A. Huffer, all of Seattle, Wash., and Harold M. Sawyer and Alfred T. Cluff, both of San Francisco, Cal., for Matthew Clancy and others.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

RUDKIN, Circuit Judge. At a few minutes after midnight on April 1, 1921, a collision occurred in the waters of Puget Sound between the steamship Governor and the steamship West Hartland. As a result of the collision the Governor sunk and, together with her cargo, became a total loss, a number of her passengers suffered serious personal injuries, and four passengers and several members of the crew lost their lives. After the collision the West Hartland proceeded to the port of Seattle under her own power, arriving on the same day, with the survivors from the Governor. She was then placed in dry dock and repaired at a cost of $63,250. A proceeding in rem was thereafter instituted by an owner of cargo lost on the Governor against the West Hartland and her owners. An independent libel was also filed by the Pacific Steamship Company, owner of the Governor, and as bailee of the cargo and personal baggage lost with the steamer. Numerous intervening libels were filed by representatives of deceased passengers and crew, by persons who had sustained personal injuries, and by owners of cargo and personal baggage lost on the Governor.

After a considerable amount of testimony had been taken in these several proceedings, and about eight months after the collision, the United States, as owner of the West Hartland, filed a petition for limitation of liability and for total exemption from liability, and offered to surrender the West Hartland and her then pending freight to a trustee to be appointed by the court. The

trustee was appointed, as prayed, the prayer for limitation of liability was granted, and the prayer for total exemption from liability denied. The case then proceeded to final decree. The court adjudged both vessels at fault, disallowed a claim of the United States for the repairs made after the collision, allowed interest on the pending freight from the date of the collision to the date of payment to the trustee, and disallowed interest on the claims for death, personal injuries, and loss of cargo and baggage. Other provisions of the decree are not involved on the present appeal. In addition to the foregoing, the Pacific Steamship Company, as owner of the Governor, claiming that the West Hartland was of greater value at the close of the voyage on April 1, 1921, than at the date of surrender, petitioned the court that an appraisement be had of the full value of the vessel at the date of the close of the voyage, and that as a condition precedent to the granting of the prayer for limitation of liability the United States be required to pay into court the value as determined by the appraisement, or in the alternative to pay the difference between the appraisement as of the date of the close of the voyage and the value of the vessel as of the date of surrender. The court found, however, that the value of the vessel at the date of surrender was not less than its value at the close of the voyage and denied the relief claimed.

The United States has appealed from that part of the decree adjudging both vessels at fault, from the disallowance of the claim for repairs, and from the allowance of interest on the pending freight from the date of the collision to the date of payment. The claimants for damages for death, personal injuries, and loss of cargo and baggage, have appealed from the refusal of the court to allow interest on their several claims, and the Pacific Steamship Company has appealed from the refusal of the court to direct an appraisement or require the United States to pay into court the difference between the appraisement as of the date of the close of the voyage and the value of the vessel as of the date of surrender.

There has been no appeal from that part of the decree adjudging the Governor at fault, so that we are only concerned with the fault of the West Hartland. However, a solution of the question involves, in a measure, the conduct and movements of both vessels immediately preceding the accident. The collision occurred at 12:04 a. m. of the day in question. The Governor, north bound from California ports, left Victoria, B. C.,

at 9:45 p. m. of the preceding day, setting her course south 82 degrees east to Point Wilson. Abeam of Point Wilson this course was changed to south 68 degrees east. She continued on the latter course at a speed of 15 knots per hour until just before the collision. She passed abeam of Point Wilson at 11:57 p. m. and two or three minutes later a light was reported on the starboard bow. The pilot went out on the starboard wing of the bridge and examined the light in question through his night glasses. The light thus reported was in fact the light of the West Hartland, but inasmuch as it was directly in line with a red light on the Ft. Flagler dock, the pilot mistook the former for the latter and continued under that misapprehension until just before the collision. The near approach of the West Hartland was not discovered until she sounded a single blast of the whistle about 1,500 feet distant and a less distance from the point of collision. The Governor thereupon immediately sounded three blasts of her whistle and reversed her engines full speed astern. The collision followed almost immediately.

[1, 2] After taking on lumber at British Columbia ports, the West Hartland repaired to Port Wells for fuel oil, and proceeded thence to Port Townsend, discharging her pilot in Port Townsend Bay. Capt. Alwen took charge of the navigation of the vessel in the bay at 11:50 p. m., or about a quarter of an hour before the collision. At 11:53 or 11:54, he saw the running lights of the Governor about a mile northerly of Point Wilson and from that time to the time of the collision the lights were in plain view. He was familiar with the course and speed of the Governor and assumed at all times that she would safely cross his bow. He rested under that assumption until almost the moment of the collision. When he gave the single blast signal, he thought that the Governor was about three-fourths of a mile away, whereas the actual distance between the two vessels did not exceed 1,500 feet. He had scarcely given the signal, indicating that he intended to maintain his course and speed, when he discovered that he could not carry out that maneuver, so he immediately reversed his engines full speed astern, without notice or warning. The court below found that if the West Hartland had maintained her course and speed without reversing, she would have passed safely ahead of the Governor, and that if the Governor had maintained her course and speed without reversing, she would have passed safely ahead of the West Hartland.

In each case the court assumed, of course, that the other vessel reversed full speed astern. These findings are supported by the testimony, but they only go to show the narrow margin between safety and disaster. After giving the signal that she would maintain her course and speed, the West Hartland was at fault in reversing her engines full speed astern without notice or warning. But we think that the decision should be placed on broader grounds. Here two vessels collided on the broad expanse of Puget Sound, on a smooth sea, under a cloudless sky, where the lights on the vessels could be seen for miles. The excuse offered is that one of the navigators mistook the lights, and the other misjudged the distance. That there was culpable negligence on one side or both must be conceded. The fault of the Governor is not in issue here, and the excuse offered by the West Hartland is that she was the privileged vessel, and that it was the duty of the Governor to keep out of her way. This is true, in a measure, but the privilege is not an absolute one. As said by the court in The New York, 175 U. S. 187, 205, 20 S. Ct. 67, 74 (44 L. Ed. 126):

"Her only excuse for her omission is that she was the preferred vessel within the nineteenth American and sixteenth Canadian rule, and that by the twenty-third American and twenty-second Canadian rule, it was her duty to keep her course. But the fact, that a steamer is entitled to hold her course does not excuse her from inattention to signals, from answering where an answer is required, or from adopting such precautions as may be necessary to prevent a collision, in case there be a distinct indication that the obligated steamer is about to fail in her duty. As was said in the case of The Sunnyside, 91 U. S. 208, 222: 'Cases arise in navigation where a stubborn adherence to a general rule is a culpable fault, for the reason that every navigator ought to know that rules of navigation are ordained not to promote collisions, but to save life and property by preventing such disasters.' * * * Both the Canadian and American codes provide that in construing and obeying these rules, due regard must be had to all dangers of navigation and to any special circumstance which may exist in any particular case, rendering a departure from them necessary in order to avoid immediate danger."

[3] For some considerable time before the collision, the master of the West Hartland was in doubt as to the course the Governor intended to pursue, and under such circumstances it was his plain duty to solve that doubt in favor of safety by giving a danger signal or taking timely steps to avoid a collision before plunging his vessel into a position where a collision would be the natural, if not the necessary, consequence. The Mauch Chunk, 154 F. 182, 83 C. C. A. 276; Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., 215 F. 859, 132 C. C. A. 201; The Coamo (C. C. A.) 280 F. 282; The George S. Tice (C. C. A.) 287 F. 127; The Jason (D. C.) 288 F. 57. In the Yang-Tsze Ins. Ass'n v. Furness, Withy & Co., supra, the court said:

"The loss of property for which a recovery is sought was due to a collision on the high seas, in broad daylight and in clear weather, and with no other vessels about to embarrass or interfere with navigation. The two vessels involved were steamers, and therefore could be maneuvered more easily than any other kind of vessels. They were in plain sight of each other when miles apart. They nevertheless came into collision and with such force that one of them sank in a few hours, carrying down with her the entire cargo. It is difficult to see how it all happened unless both vessels were in fault and failed to exercise reasonable care. Plain common sense constrains one to such a conclusion. To exonerate either of them under such conditions can be justified only if upon the closest scrutiny of the navigation of each vessel it can be discovered that one of them was free from all culpable blame. We have examined the evidence in the case with care, and we have not been satisfied that either one of these vessels was free from fault. The vessels that navigate the high seas, and indeed vessels that navigate inland waters, intrusted with human lives and property of great value, must be held to the strictest standards of conduct, and when they fail to observe the requirements which the maritime law of the nations has prescribed, are to understand that they must abide the consequences."

And in The Coamo, supra, the court said:

"It is not disputed, nor disputable, that a more inexcusable collision has rarely been presented to any court. It occurred on a fair, clear day, in waters most familiar and then uncrowded, and between vessels which could without difficulty have seen each other for miles, and were (as to tug and steamer) full powered, fully manned, and in perfect repair. These are material facts in considering the probability of collision occurring without mutual fault."

In those cases the collisions occurred in the daytime while here the collision occurred at night, but notwithstanding this difference

the vessels could be here seen through the darkness for miles and the collision was equally inexplicable and equally inexcusable.

[4] No authority has been cited in support of the claim for general repairs and we have found none.

"If the vessel arrives in port in a damaged condition, and earns some freight, the value at that time is the measure of liability; if she goes to the bottom and earns no freight, the value at that time is the criterion. And the benefit of the statute may be obtained either by abandoning the vessel to the creditors or persons injured, or by having her appraisement made and paying the money into court, or giving a stipulation in lieu of it, and keeping the vessel." The City of Norwich, 118 U. S. 468, 6 S. Ct. 1150, 30 L. Ed. 134.

In this case the owner elected to pursue the former course and surrender the vessel to a trustee. This surrender was necessarily absolute and unconditional, and to now impress the funds in the custody of the court with a lien for repairs made after the collision would be unjust to creditors and other claimants. In any event, the difference between the selling price at forced sale a year after the collision and the cost of making repairs almost a year before would have little, if any, tendency to establish, and would not establish, the actual value of the vessel at the close of the voyage. To that value the creditors were entitled, and the court below did not err in refusing to allow for repairs beyond the expenses necessarily incurred in preserving the vessel and saving her from destruction.

The question of interest on the pending freight is not here involved. When the petitioner rested its case on the limitation issue, the respondents moved the court to dismiss, upon the ground that the petitioner had failed to surrender the pending freight to the trustee. After some discussion, the court expressed the opinion that the surrender should be made, with interest, and counsel for the government left it to the court to say whether interest should be allowed. No exception was taken to the ruling of the court, and there the matter ended until long after the payment was in fact made.

[5] We are inclined to the opinion that the claim for interest in behalf of claimants for damages for death, personal injuries, loss of cargo and baggage is foreclosed by the stipulation of the parties. The Princess Victoria, 242 F. 918, 155 C. C. A. 506. But, in any event, the claim was a general one in behalf of all claimants, including death claims and personal injury claims, and it will not be seriously contended that interest on claims of the latter class, at least, is recoverable as a matter of right.

As already stated, the shipowner must surrender the value of the vessel as of the date of the close of the voyage; but, if this has been done, as found by the court below, there is no just cause for complaint. During the period in question, the United States owned a large number of vessels of this general class, and, no doubt, uncertainty as to its future policy and other causes, left the market for ships in a very chaotic state. But the testimony tends to show that there was little or no change in market conditions between the date of collision and the date of surrender, and the finding of the court that the value of the vessel on the date of surrender, with repairs added, was fully equal to the value at the close of the voyage, is amply supported by the testimony. Under all authority, such a finding is controlling here.

We find no error in the record, and the decree is affirmed.