---

## In re REND.

(District Court, D. Minnesota, Fifth Division. November 27, 1903.)

1. COLLISION—STEAM VESSELS MEETING—NEGLIGENT CHANGE OF COURSE.

The steamer Thomas Wilson, leaving Duluth, and the steamer George G. Hadley, coming in, were approaching each other in the daytime, port to port, on nearly parallel but slightly diverging courses, sufficiently far apart to involve no danger of collision if maintained. When 1,500 feet apart, the master of the Hadley, having received instructions from a tug to proceed to a different port, ordered the helm hard astarboard. The master of the Wilson, observing the change of course, and supposing the Hadley to be sheering, at once put his helm aport, and afterwards hard aport, maintaining his speed until his vessel was struck on the port side by the Hadley and sunk. Each vessel was going at a speed of about 11 or 12 miles, and no signal was given by either until they were within 900 feet, and approaching each other, when the Hadley gave a signal of two whistles, which was not answered, and she then reversed, but made no change in course. *Held*, that the Hadley was solely in fault; that, in view of the original courses, no signal was required from the Wilson by the rules; that she was prudently navigated, and was not in fault for failing to answer the Hadley's signal, because she could not then have avoided collision, and also because she acted in extremis.

2. SAME—DAMAGES—DEATH OF SEAMEN.

Damages awarded against the vessel in fault for a collision in Lake Superior for the death of seamen under the rule of the Minnesota Supreme Court.

In Admiralty. Proceeding for limitation of liability for damages growing out of collision.

C. E. Kremer, H. G. Goulden, and H. T. Abbott, for petitioner.

Alex. Marshall, Davis, Hollister & Hicks, J. H. Norton, A. H. Coldham, and Hoyt, Dunton & Kelly, for various intervening claimants.

MORRIS, District Judge. This action is brought by the petitioner, William P. Rend, owner of the steamer George G. Hadley, under the statute, to limit his personal liability for damages resulting from a collision between that steamer and the steamer Thomas Wilson, in Lake Superior, just outside the harbor of Duluth. The Hadley was appraised, and a bond for $23,998.23 was filed, with approved security, to abide the order of this court in determining the liability of the Hadley. This court, by its order, required all persons interested to intervene. The Pittsburgh Steamship Company, on its

own behalf, and on behalf of the owner of the cargo, the Oliver Iron Mining Company, and on behalf of the surviving members of the Wilson's crew for the loss of their personal effects, intervened, and alleged that it had sustained a loss of $150,000, the value of the Wilson, together with $2,605.60, the value of the freight lost, and that the value of the cargo was $6,839.70, and that the personal effects which were lost of the surviving members of the crew was $510. Intervening libels were filed by Jacob E. Fink, administrator of the estate of Guy Fink, deceased; William C. McCarter, administrator of the estate of William Roebuck, deceased; M. H. McMahon, administrator of the estate of James McDougal, deceased; Archie Campbell, administrator of the estate of John Campbell, deceased; and Frank Hicks, administrator of the estate of James M. Fraser, deceased. All of the deceased were members of the Wilson's crew at the time of the collision, and were drowned in that vessel. The facts are as follows: On the 7th day of June, 1902, between 10 and 11 o'clock a. m., the steamer Thomas Wilson, a vessel of the whaleback type, 308 feet long by 38 feet beam, owned by the Pittsburgh Steamship Company, left the harbor of Duluth, bound down the Lakes, laden with a cargo of 3,257 tons of iron ore. The vessel proceeded through the canal between the piers marking the entrance to the harbor of Duluth (which are parallel to and distant from each other 300 feet) at a slow rate of speed, and about on the center line, or axis, of said entrance. After clearing the piers, her course was changed a quarter of a point to the southward, and she was thus put upon her regular course down the lake, northeast by east three-quarters east. At the same time that her course was thus changed to the southward, full steam was put on, so that she would in a short time acquire her usual running speed of about 12 miles an hour. The weather was clear, and the sea calm. At the same time the steamer George G. Hadley, a vessel 288 feet long by 40 feet beam, owned by petitioner, William P. Rend, and laden with a cargo of coal, was approaching the harbor of Duluth on a course somewhat to the northward of the course of the Wilson, and about on the line of the north pier of said entrance extended, and going directly towards said pier. The said steamer Hadley was proceeding at a speed of about 10 miles an hour, which speed she kept until she commenced to back her engines as hereinafter set forth. Just after the Wilson had left said entrance, a tug, the Annie L. Smith, came out of the harbor, and proceeded towards the Hadley, with orders to that steamer to go to Superior. Said tug rounded to under the port quarter or stern of the Hadley, and gave said orders to her master, who had turned his back towards the bow of his boat in order to hear what was being said from said tug. The master of the Wilson did not know for what purpose the tug came out of the harbor, nor did the master of the Hadley until he had received said orders. When the master of the Hadley received said orders, without turning around and looking ahead, and without giving any signal, he looked down through the hole in the top of the pilot house, and called to the wheelsman, and gave an order to put the wheel hard astarboard. At the time said order was given the Hadley was proceeding on her course as above set forth. At this time the steamer

Wilson was a little more than a quarter of a mile—about 1,500 feet —distant from the Hadley, and still proceeding on her regular course. The Hadley at once answered her helm, and began swinging to port. Observing this, and thinking that possibly the Hadley was sheering from her course, the master of the Wilson put his wheel aport, and immediately afterwards, observing that the Hadley continued to swing to port, he put his wheel hardaport, and the Wilson began to swing sharply to starboard, and away from the Hadley. At this time the Wilson had acquired a speed of about 11 miles an hour. Both vessels continued to swing, the Hadley to port and the Wilson to starboard. Neither slackened its speed. When at a distance of about 900 feet from the Wilson, the master of the Hadley turned, and looked ahead, and seeing the Wilson, and that a collision was imminent, gave a signal of two short blasts from her whistle, and immediately thereafter stopped and backed her engines, continuing under a hard astarboard wheel. Prior to this time neither vessel had given any signal to the other. The Wilson did not answer this signal, and continued at full speed swinging under a hard aport wheel. Within a few seconds the Hadley came into collision with the Wilson, striking her bow on, in an overtaking direction, about 75 feet from her stern on the port side, and at an angle of about 33 degrees, and cut into her nearly to the middle. The Wilson immediately filled and sank, and was a total loss, and nine members of the crew of the Wilson were drowned, amongst whom were the five members whose administrators have filed intervening libels as hereinbefore set forth. The point at which the collision took place was about 900 feet south of the center line or axis of the entrance to the Duluth harbor prolonged, and a little less than seven-eighths of a mile from the outer end of the piers. The Hadley sustained some damage, and was run ashore to avoid sinking, whence it was subsequently released and repaired. The value of the cargo of the Wilson was $6,839.70, the value of the freight was $2,605.60, the value of the personal effects which were lost of the surviving seamen on the Wilson was $510, and the value of the steamer Wilson was $150,000.

Guy Fink was second cook on the steamer Wilson. He was an unmarried man, 21 years of age, and in good health. He was earning wages at the rate of $25 per month. His next of kin were his father, 58 years old, and his mother, 48 years old. He had been in the habit of contributing to their support about $15 per month in the summer time, or about $90 per annum. William Roebuck was a fireman on board the Wilson. He was 19 years of age, unmarried, and in good health. He was earning $45 per month. His next of kin were his father and mother, each about 52 years old, to whose support he had been in the habit of contributing about $100 per annum. James McDougal was an oiler on the Wilson, 23 years of age, unmarried, and in good health. He had been earning his own living since he was 15 years old. His next of kin was his mother, 55 years old, to whose support he had been in the habit of contributing about $7 per month, or $84 per annum. He had also been clothing his younger brother, his mother's child. James M. Fraser was a fireman on the Wilson, 24 years of age, unmarried, and in good health. He was

earning $40 per month. His next of kin were his father and mother, his father being 50 years of age, and it does not appear how old his mother was. He had been in the habit of contributing his savings to the support of his parents, and when not working away worked on his father's farm. His father estimated that he contributed about $250 per annum to the support of himself and wife. John Campbell was a watchman on the Wilson, earning $1.50 per day. He was about 26 years old, unmarried, and in good health. His next of kin were his father and mother. He had been in the habit of sending a part of his earnings to his mother—it does not appear how much—and in four or five years had paid $167 on the mortgage on his father's farm. His father is 63 years old and his mother is 58 years old.

From the foregoing facts it appears to me that the collision was clearly due to the negligence of the Hadley, and that no negligence is shown on the part of the Wilson which contributed to producing the collision. Neither of the vessels gave the signal required by rule 5 of the pilot rules (Pilot Rules for the Great Lakes and Their Connecting and Tributary Waters as far East as Montreal, approved by the Secretary of the Treasury, 1902) when they came within half a mile of each other. At that time it was evident to each of the masters that, if the vessels kept on their then courses, they would pass each other at a safe and proper distance, between 400 and 500 feet. The Wilson was then sailing in an oblique direction to the course of the Hadley, their courses constantly diverging, and there would have been no possible chance of a collision if they had kept on their courses. The failure, therefore, to give this signal in no way contributed to producing the accident. The danger began when the Hadley put her wheel hard astarboard. At that time the vessels were so near together that a change of course to port on the part of the Hadley was a hazardous and dangerous thing to do, and the Hadley was clearly at fault for starboarding her helm, when the vessels were so close together, without having first informed the Wilson of its intention so to do, and obtaining the latter's consent to such a change of course. When the Hadley first began to swing to port, the captain of the Wilson had a right to suppose, as he did suppose, that she was merely sheering from her course, having received no signal indicating an intention to change her course, and he had a right also to suppose that her master would almost immediately put her upon her former course. He very wisely, however, and in the exercise of due care and prudence, ported his wheel, so as to make the distance between the two vessels greater. And even when the Hadley still continued to swing to port, the master of the Wilson had a right to suppose that she would port her helm, and try to regain her former course. I think it was wise and prudent for the master of the Wilson to hard aport his wheel at that time, thus endeavoring to further increase the distance between the two vessels. Not until the two-blast signal was given by the Hadley could the master of the Wilson understand her intentions, and then it was too late for him to attempt to perform the maneuver which the Hadley's signal indicated he should perform. It would therefore have been clearly wrong for him to have answered her signal and attempted to pass upon the starboard side of the Hadley. To have done so would have made a collision practically certain.

If he had reduced speed, or stopped and backed, a collision would have been equally as certain. A collision was imminent, and his vessel was in extremis, and there was nothing left for him to do but to keep on at full speed under his hard aport helm. It is, of course, much easier, after an event has happened, and in contemplation of it, to know what might have been done to avoid it than it would have been at the time. But reviewing now all the facts of this case as they happened, I am of the opinion that the master of the Wilson, in going ahead at full speed under a hardaport helm, took the only course offering any chance of escape from the impending collision. Under rule 26 of the act of Congress (28 Stat. 649 [U. S. Comp. St. 1901, p. 2892]), he should have sounded several short and rapid blasts of his whistle after receiving the two-blast signal from the Hadley, but his failure to do so in no wise contributed to the happening of the accident, and his doing so could not in any way have helped matters.

Following the rule of damages laid down by the Supreme Court of the state of Minnesota in the case of Hutchins v. St. P., M. & M. R. R. Co., 44 Minn. 5, 46 N. W. 79, I find that Jacob Fink, administrator of the estate of Guy Fink, deceased, William C. McCarter, administrator of the estate of William Roebuck, deceased, M. H. McMahon, administrator of the estate of James McDougal, deceased, and Archie Campbell, administrator of the estate of John Campbell, deceased, are entitled to recover the sum of $3,500, each; and that Frank Hicks, administrator of the estate of James M. Fraser, deceased, is entitled to recover the sum of $5,000. I find that the Pittsburgh Steamship Company is entitled to recover in its own behalf $152,605.60, and as trustee for the Oliver Iron Mining Company, owner of the cargo, $6,839.70, and as trustee for the surviving members of the crew of the Wilson $510, the value of their personal effects lost.

I am of the opinion, and so hold, that the petitioner is entitled to a decree limiting his personal liability to the appraised value of the Hadley, as represented by the bond filed herein.

Holding, then, as I do, that the Hadley was solely at fault, the proceeds of the bond to abide the decree of the court herein must be applied to the payment of the above amounts found for the various parties pro rata.

Let decree be entered accordingly.