## LARSEN et al. v. PORTLAND CALIFORNIA S. S. CO. et al.

### No. 7011.

Circuit Court of Appeals, Ninth Circuit.

July 24, 1933.

Winter S. Martin, Arthur Collett, Jr., and Ryan, Desmond & Ryan, all of Seattle, Wash., and Albert Michelson, of San Francisco, Cal., for appellants Larsen and others.

C. E. H. Maloy, of Seattle, Wash., and Frederick W. Dorr, of San Francisco, Cal. (Andros, Hengstler & Dorr, of San Francisco, Cal., and Harroun, Maloy & Shidler, of Seattle, Wash., of counsel), for appellant Ruffino, etc.

Farnham P. Griffiths, Charles E. Finney, Russell A. Mackey, and McCutchen, Olney, Mannon & Greene, all of San Francisco, for appellees.

Before WILBUR, SAWTELLE, and MACK, Circuit Judges.

WILBUR, Circuit Judge.

Between 3:07 and 3:09 on the morning of September 1, 1930, the Admiral Nulton overtook, collided with, and sank, the fishing vessel Orient in the Straits of Georgia at a

point in Stephens Passage about one mile north of Sisters Island, in British Columbia waters.

The Admiral Nulton was a steel vessel 335 feet 6 inches in length, beam 46 feet, gross tonnage 3,545, net tonnage 2,174, and was propelled by steam turbine and a single right-handed screw propeller. At full speed ahead the Admiral Nulton made 10 knots. The Orient, owned by Sedolph H. Rudd, her master, was a wooden fishing vessel twenty years old, length 62½ feet, beam 18 feet; gross tonnage 57; net tonnage 48; operated by Diesel engines; average full speed ahead 7½ knots.

As result of the collision the Orient was cut in two athwartships. This proceeding was brought by the owner of the Admiral Nulton, the Portland California Steamship Company, for the limitation of her liability resulting from the collision. Claims were filed on behalf of the relatives and representatives of the deceased seamen and on behalf of the owner of the Orient. The trial court found that the collision resulted solely from the negligence of the Orient in suddenly changing her course from one substantially parallel to that of the Admiral Nulton to one directly across the bow of the Admiral Nulton.

Both vessels, being bound for Seattle, came through Discovery Passage with Cape Mudge on the port hand, and both were headed for the passage between Sisters Island and Flat Island, which is 1.2 miles wide, distant 42.2 miles along the course sailed by the Admiral Nulton, and 42 miles according to the course sailed by the Orient. Although there was ample water to the westward of Sisters Island, it is customary for ships bound for Seattle to pass through this relatively narrow passage because of the comparative ease of navigation by reference to Sisters Island light. The Admiral Nulton, after 2:40 a. m., headed for a point in the passage three-quarters of a mile from Sisters Island. According to the log of the Orient, which was recovered from the sunken vessel, she passed Cape Mudge at 9:50 p. m. August 31, and steered a compass course from there E. by S. ½ S. which corrected for 1° easterly deviation gave a magnetic course of 108° (107⅞°). This was her usual course from Cape Mudge to Stephens Passage. The Admiral Nulton, according to her log, passed Cape Mudge at 11:04 p. m. August 31, and she then altered her course to 106° by her standard compass. Her deviation card showed ½° westerly deviation for this course, which would give a corrected magnetic course of 105½°. The course of 106° was her usual course to a point opposite Cape Lazo, which was to be passed 4 miles abeam, whereupon her course was usually altered to 111° standard compass. The log of the Admiral Nulton shows that such a change was made at 1:11 a. m. September 1, with Cape Lazo 3.8 miles abeam. The deviation for this course, as shown by the deviation card of the Admiral Nulton, was ½° W., making magnetic course 110½°.

As nearly as we can ascertain their relative positions at 2:40 a. m. dead reckoning, allowing an acceleration of 4 miles per hour along the course due to the ebb tide, which is the amount of acceleration of the Admiral Nulton from Cape Mudge to Cape Lazo, and assuming the bearing of the Orient to be 1½ points on the starboard bow of the Admiral Nulton at 2:40 a. m., the Orient was then about 3,100 feet distant at a point 900 feet to starboard of the course of the Admiral Nulton, with courses converging 2½°. At that hour (2:40 a. m.) the Admiral Nulton changed her course to 108° standard compass (107½° magnetic), thus making the courses of the two vessels parallel, and indicating a passing with Orient 900 feet on the starboard beam of the Admiral Nulton.

In this calculation we assume that both vessels departed from Discovery Passage from a point in midchannel. The item of 900 feet should therefore be increased or decreased by the unknown distance between the positions of the vessels as they left Discovery Passage, which was a little over a mile in width. It was the custom of the Admiral Nulton to leave Discovery Passage midchannel, and it is likely that the Orient did not substantially vary from that point. The course of the Admiral Nulton having been changed at 2:40 a. m. from 111° to 108° to give Sisters Island a wider berth, the bearing of the light thereon at that hour was 6° off the Admiral Nulton's starboard bow. The light was estimated to be 5 miles distant. This change would increase clearance of Sisters Island a quarter of a mile; that is, from one-half mile to three-quarters of a mile. From 2:40 a. m. the witnesses for the appellees, who were on board the Admiral Nulton, testified that the bearing of the Orient's light on the Admiral Nulton's bow gradually increased from about 1½ to 4 points (45°) at 3:05 to 3:07 a. m. This indicated a parallel or slightly diverging course.

Mr. Clement, who was on the bridge of the Admiral Nulton, testified that at about 3:07 a. m. he starboarded the Admiral Nulton's helm, changing the course to 103° (5° to starboard) to give the Orient a wider

berth, and that he indicated the change by two whistles. Mr. Clement testified that after this change to 103°, as he stood watching the Orient's light, "all of a sudden she swerved to the left and started to cross my bow"; that he instantly "ordered her helm hard astarboard and the engines full astern." The order was promptly executed. The collision occurred at 3:08½ a. m. (a minute and a half after the change in course). The engines of the Admiral Nulton were stopped at 3:09 a. m. The witness estimated that without the 5° change of course at 3:07 a. m. the vessels would have passed with a clearance of at least 700 or 800 feet and after change of course by the Admiral Nulton of at least 1,000 feet. This distance of 700 or 800 feet conforms closely to our estimate based on dead reckoning of 900 feet.

As the night was so dark that nothing of the Orient was visible except its stern light, it is evident that the turning of the Orient, so far as it was visible from the Admiral Nulton, would be merely the turning of a point which, of course, is not observable. Consequently, the testimony of Clement is attacked as a base fabrication, designed to exculpate the Admiral Nulton and inculpate the Orient. Clement was asked to explain his testimony that the Orient turned "like a flash and started across your bow at a right angle course." He replied, "Well, that is something hard to explain. I suppose it is going to be from experience. I just know that the ship was going across there, that is all. * * * I know this much, that I can judge if a vessel starts to cross my bow, just like she did there, if that ever happens again I would be able to tell it again."

Assuming that this witness tells the truth, what did he observe if the Orient suddenly changed her course at right angles to the course of the Admiral Nulton to cross her bow? He would see a light which had slowly broadened on the bow from one and a half points at 2:40 a. m. to four points at 3:07 a. m. begin to close in on the bow with alarming rapidity, so that in about a minute and a half the bearing completely closed. That he did observe some change in the light of the Orient that caused him to order the helm hard astarboard at 3:07 a. m. and the engines reversed is clear from the evidence. The Admiral Nulton was then about 1,170 feet from the point of collision. (Capt. McCauley fixed her average speed to point of collision at 7.8 knots, or 780 feet a minute, or 1,170 feet in a minute and a half.)

Rasmussen, the lookout on the bow of the Admiral Nulton, testified that the Admiral Nulton blew two whistles "three or four minutes before the collision"; that the Orient changed course and came across the Admiral Nulton's bow; that he looked over the bow and saw both vessels at the moment of impact; and that they were at right angles at that time.

The after portion of the Orient was recovered a few days after the collision. Its appearance is indicated in the attached photograph.

The condition of the after part of the Orient is pointed out by the appellees as indicating that the impact was at right angles. The point of impact is marked on the hull of the Orient by red paint scraped from the bow of the Admiral Nulton, and was pointed out by the witness T. C. Warkman and marked in ink by the arc of the circle. The point of contact is a foot or two below the poop deck on the line of breakage. This witness, Warkman, had been surveyor for the Salvage Association of London for thirty years. He viewed the wreck for the purposes of ascertaining the responsibility for the collision. He testified most positively that in his opinion the break in the hull of the Orient was the result of a blow at right angles from the stem of the Admiral Nulton. He positively and unequivocally adhered to this opinion, notwithstanding every ingenious theory propounded by astute and learned counsel in an attempt to suggest some way in which vessels approaching each other on slightly converging courses could swing or be swung into right angle positions, before the lighter vessel, the Orient, broke or was cut in two. "To me," he said, "it is as absolutely clear and convincing a case of a right angle blow as I have ever seen in my experience, barring nothing."

Mr. B. S. Frankfort, of Vancouver, B. C., for twenty years superintendent of the Pacific Salvage Company who raised the wreck for that company, at the instance of the underwriters, examined the condition of the raised portion of the hull of the Orient, and testified that in his opinion the Orient was struck at right angles to her keel; that in his opinion the hull of the Admiral Nulton cut straight through the port planking of the Orient, to and through her keel and starboard garboard; that the planking on the starboard side was broken by the force of the impact; and that he was absolutely sure that the angle of the impact could not have been as little as 75°.

■ The appellants vigorously attack the credibility of the witness Clement, particularly upon the ground that he could not see a light suddenly turn; that he made no entry in the log of the sudden turn of the Orient; that his spontaneous explanation to the captain, when the latter came on the bridge, did not refer to the change of course of the Orient, but did impliedly indicate that Clement was busy preparing to take a four point bearing of the lighthouse on Sisters Island, and perhaps lost track of the Orient's light a few moments before the collision; that the re-

ports made by the captain of the collision made no mention of the fault of the Orient; and that mathematical calculations of the bearing and distances he gave would give the vessels clearance even if the Orient did change its course. It is a sufficient answer to this argument and others so advanced that, where the trial court has a chance to observe a witness on the stand, his acceptance of the witness' testimony is conclusive on this court on the question of credibility, and this court must examine the testimony on the assumption that the witness is honestly endeavoring to state the facts as he saw them, and it should be added that, entirely aside from this rule, we find nothing in the testimony of this witness which indicates an intention to deceive. It may well be that, in reviewing the circumstances of the collision in the light of the subsequently ascertained condition of the hull of the Orient, his impressions as to the Orient's conduct before he knew the condition of the Orient's hull may have been confirmed, or perhaps reviewed and modified. This may result in inconsistent statements. Every lawyer knows that the attempt to reconstruct and explain a sudden and unexpected happening such as a collision on land or sea, with its appalling consequences, is an effort of reason as well as of memory, and that what the reason of the witness indicates must have occurred as a result of what he saw or knows, he remembers or testifies that he remembers, did occur. The books are full of expressions about the "memory of a witness," but, after all, no one knows what memory is or how it functions. What the courts ask and expect of a witness is that he shall state the facts to the "best of his recollection" and not to remember facts that did not occur or forget facts that he knows did occur. When an honest witness states facts which are inherently improbable, we ascribe his erroneous testimony to a want of power to observe, distinguish, and describe what he saw.

■ For these reasons we conclude that the decision of the District Court is correct in placing the entire blame upon the Orient because of her change of course. In support of this conclusion we advance another fact with some hesitancy because it is not discussed by the parties. Capt. Edward McCauley, U. S. N., retired, testified that in the minute and a half which intervened between the orders, "hard astarboard" and "full astern," on the Admiral Nulton, and the collision, allowing thirty seconds to stop the engines and fifty seconds for reversing, the Admiral Nulton would lose speed to 5.8 or 6 knots. If the vessels were going in substan-

tially the same direction, then at the end of the minute and a half the Orient was going faster than the Admiral Nulton, and there could have been no collision. Even if we assume a greater delay in stopping the engine and in reversing it, the relative speed of the Admiral Nulton at the time of the collision would at the most be only slightly greater than that of the Orient. It seems incredible, notwithstanding the overwhelming mass of the Admiral Nulton and the frailty of the Orient's hull, that a collision substantially in the line of the Orient's course, at a relative speed of only two and a half knots, could have wrought such havoc as the evidence discloses to have resulted from the collision. As there is no expert testimony as to the effect of a collision at any relative speed less than 4 knots, or at any angle less than 45°, we refrain from further discussion of the subject; suffice it to say that the obvious result of the blow, as well as the testimony of the experts as to its angle, tends to confirm the testimony of the witnesses on the Admiral Nulton as to a change of course on the part of the Orient.

We have not undertaken to fully discuss all the claims of the appellants. It required a 291-page brief for the appellants to present such matters, but it is sufficient, we think, to say that for the foregoing reasons we see no adequate cause for disturbing the finding of the trial court that the accident resulted solely because of the fault of the Orient in making a sudden, unexpected and unnecessary change of course to the left without observing the approach of the Admiral Nulton, without warning and without posting a lookout who could observe whether such a change could be safely made.

The law applicable to the case is fully set forth by able counsel for the appellants, and is, in the main, conceded without discussion to be a correct exposition of the relative duties of an overtaking and an overtaken vessel in British waters. Appellees contend that the facts found by the trial court completely exculpate the Admiral Nulton, and with this we agree, notwithstanding the suggestion of appellants that it was the duty of the overtaking vessel to anticipate a possible change of course of the overtaken vessel. We agree that this rule does not require the overtaking vessel to anticipate a right angle change of course of a vessel overtaken which is believed to be, and in fact is, headed for the same narrow channel as the overtaking vessel.

Decree affirmed.