## PURATICH v. UNITED STATES.
### No. 9915.

Circuit Court of Appeals, Ninth Circuit.
April 1, 1942.

S. Hasket Derby, Joseph C. Sharp, James A. Quinby, Lloyd M. Tweedt, and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before WILBUR, GARRECHT, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellant, owner of the fishing boat Lone Eagle, filed a libel against the United States, as owner of the destroyer Crosby, to recover damages for the loss of the Lone Eagle in a collision with the Crosby. The Crosby was undamaged. The court, concluding that the collision was the sole fault of the Lone Eagle, dismissed the libel. On the trial the fault of the fishing vessel was admitted, so that the only question here concerns the right of her owner to have the loss divided.

The Crosby is a vessel approximately 314 feet in length, with a 35-foot beam and a draft of 12 feet. The Lone Eagle was a wooden ship 59.9 feet long, with a beam of 17.1 feet, and a gross tonnage of 51.05 tons. She was proceeding northward from San Pedro to Gig Harbor, Washington, with a crew of seven men. Between 7 and 8 o'clock on the evening of April 3, 1940, she passed Point Arguello and thereafter pursued a compass course of 330°, or 346° true.[1] Prior to 9 o'clock of that evening the Crosby, which was on neutrality patrol in the vicinity and which had been pursuing a course due north, made a wide-turning circle and changed her course to due south, 180° true. She thereafter continued on that course until the collision, which occurred at approximately 9:29½ p. m., according to the court's determination.

Following is a summary of the findings: The Crosby had steam on two of her four

---

[1] Apparently neither the master nor the mate of the Lone Eagle understood the difference between the magnetic compass course and the true course.

boilers and was proceeding at a speed of 11 knots. She was in charge of competent officers and men, on watch and attentive to their duties, was properly supplied with, and had in use, navigational equipment as required by law, and was in all respects seaworthy. From sunset she was burning the necessary navigational lights, her side and range lights being visible at a considerably greater distance than required. The sky was overcast and visibility was very good. There was a light westerly breeze and moderate westerly swells. The destroyer had three lookouts on the bridge, which is 21 feet above the surface of the water and 75 feet from the bow. No lookout was stationed in the bow.

At 9 o'clock in the evening the Lone Eagle changed her helmsman, the new helmsman being a young Japanese fisherman who had had some previous experience on the vessel. No one was on watch to assist him or to direct the navigation of the ship. No one was on duty in the engine room, the helmsman having direct control of the engine from the pilot house. There was no lookout on duty. In case of need the helmsman could, and in fact did, call for the advice of the ordinary seaman who served in the capacity of mate. The latter was off duty, resting in his bunk. The single masthead light and navigational side lights of the Lone Eagle were not lighted until approximately 9:15 p. m., or long after sunset. There is evidence that her port light was not burning thereafter and also testimony that it was; but the court thought it unnecessary to resolve the conflict, as the port light was either not visible at the distance required by law, or it was in some way obstructed. For several hours preceding and up to the time of the collision the Lone Eagle was moving at her full speed of 10 knots.

At 9:15 p. m. the Crosby's officer on watch saw the masthead light of the Lone Eagle on his port bow, and the destroyer's lookouts also saw and reported the light at the same time. The two vessels were then 5 to 6 miles apart. Immediately the officer took the Lone Eagle's bearing by means of the pelorus and determined it to be 166½° true. The bearing remained nearly steady for some four minutes and then began to broaden on the Crosby's bow. When the commanding officer of the Crosby came on the bridge about 9:24 or 9:25 (where he remained until the collision), the Lone Eagle was about a mile and a half distant and her bearing was still changing to the Crosby's left. At 9:25 the deck officer could see through his binoculars the white hull of the Lone Eagle and her port side. This observation of the ship's side and hull, her changing bearing, and her apparent course, indicated that the two vessels were on a course which would permit them to pass, port to port, at a distance of at least 100 to 200 yards abeam. Since the port side light of the Lone Eagle was not visible to the Crosby's officers, even through binoculars, it was believed to be out.

At approximately 9:28 the Lone Eagle, then being at a distance estimated at about 700 yards, and being 162° on the Crosby's port bow, made a sudden turn to her own left and her green light came into view. The Crosby immediately put her engines full astern and blew three blasts on her whistle. As the Lone Eagle did not slacken speed and as her continuing course evidenced an intention to cross the bow of the Crosby, the latter's commanding officer ordered the rudder hard left in an effort to avoid or minimize the effect of a collision. The two vessels came together at approximately 9:29½ o'clock, the Crosby striking the Lone Eagle about one-third of her length from the stern at an angle of 45 to 55°, penetrating the side of the fishing vessel to a distance of 3 to 4 feet. The Crosby's speed at the moment of the collision was less than 5 knots. The Lone Eagle sank within a few minutes, her crew being rescued without injuries.

As to the situation from the standpoint of the Lone Eagle, the court found that her master first sighted the white range and masthead lights of the destroyer at 9 p. m. on his starboard bow, at a distance of more than 10 miles and when the Crosby was changing her course from north to south. Not seeing her navigational side lights, the master and others aboard the Lone Eagle assumed that the Crosby was anchored. The master then left the pilot house and did not see the Crosby again until after the collision. At 9:28, the ordinary seaman who acted as mate went on deck at the request of the helmsman to observe the Crosby. The seaman saw the destroyer in motion at a distance and on a course which his experience did not enable him reliably to estimate. Not knowing what the proper maneuver might be, the seaman directed the helmsman to change the Lone Eagle's course to hard left, thus bringing

the Lone Eagle directly ahead of the Crosby and causing the collision. Had the fishing boat continued her course or turned right the vessels would have passed abeam at a safe distance, port to port.

■ From these facts the court concluded that the collision was caused solely by the negligent navigation of the Lone Eagle and her lack of adequate and competent personnel.

Appellant argues that since the night was clear, the weather calm, and visibility and sea room unlimited, it is not rational to believe that a collision would have occurred had not both vessels been at fault, citing The West Hartland, 9 Cir., 2 F.2d 834, 836, Yang-Tsze, etc., v. Furness, Withy & Co., 2 Cir., 215 F. 859, and The Coamo, 2 Cir., 280 F. 282. There are situations concerning which such an observation is just, but we think this is not one of them. It is rather clear that the vessels collided because the inexperienced helmsman of the Lone Eagle, in an access of panic, did the one thing needful to put his ship in danger. It is obvious from their testimony that neither the helmsman nor the young seaman who undertook to advise him knew what it was all about; but by what prescience was the Crosby to divine that?

■ It is said that the vessels were meeting nearly end on and therefore it was the duty of the Crosby to turn to starboard, in conformity with Article 18 of the International Rules, 33 U.S.C.A. § 103. However, as the rule states, it applies only "to cases where vessels are meeting end on, or nearly end on, in such a manner as to involve risk of collision, and does not apply to two vessels which must, if both keep on their respective courses, pass clear of each other." The rule governs in situations where, by night, each vessel is in such a position as to see both the side lights of the other. Such was not the position here. It is true that some five minutes prior to the collision the deck officer of the destroyer had caught a momentary glimpse of the Lone Eagle's green light—a circumstance which the officer attributed to excessive yawing—but at no other time was her starboard light seen until she turned into the destroyer's path. The failure to see the green light was not the result of inattention, but was plainly due to the course and position of the vessels in relation to each other. Perhaps, out of an abundance of precaution, the Crosby might have given the fishing vessel a wider berth; but we think her failure to do that should not be classified as a fault. Had each vessel proceeded on her course, there was sufficient margin for each to pass the other in safety, port to port. A vessel on the high seas can not be expected to anticipate that the observed course of an approaching ship will be altered suddenly and unaccountably so as to create a situation of peril where none before existed. The Atlantic City, 3 Cir., 143 F. 451; In re Rend, D.C., 126 F. 564; The City of Macon, 3 Cir., 92 F. 207; Larsen v. Portland California SS Co., 9 Cir., 66 F.2d 326.

■ Appellant urges on the authority of The Ariadne, 13 Wall. 475, 20 L.Ed. 542, The Walter A. Luckenbach, 9 Cir., 14 F.2d 100, and similar cases, that the Crosby was guilty of a contributory fault in failing to have a lookout stationed in the bow. In respect of the position of the lookout, the court found that owing to the lowness of the Lone Eagle in the water and the westerly swells, the lookout's post on the bridge was as good as, if not better than, a position at the bow. However that may be, we see no possible connection between the happening of the collision and the failure of the Crosby to maintain a lookout in the forward part of the ship. The Lone Eagle was sighted as soon as her lights were turned on, and her course and position were thereafter for nearly a quarter of an hour under constant and meticulous scrutiny. In the circumstances shown, a lookout in the bow would have contributed nothing to the "eyes or ears" of the ship. See The Blue Jacket, 144 U.S. 371, 390, 12 S.Ct. 711, 36 L.Ed. 469; The Eagle, 9 Cir., 289 F. 661.

■■ Other points are argued, but they are not of sufficient merit to warrant discussion. Even if the case on its facts were less strong than it is, we would not be justified in disturbing those of the findings which rest on conflicting evidence. The bulk of the testimony, including that of the commander and all but one other of the witnesses for the Crosby, was taken orally; and questions of credibility, at least, were for the trial court.

Affirmed.